COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges O'Brien, Callins and Senior Judge Annunziata


HANK SMITH, JR.

MEMORANDUM OPINION*
v.       Record No. 0541-21-3                                          PER CURIAM
                                                                  NOVEMBER 16, 2021
HARRISONBURG ROCKINGHAM
 SOCIAL SERVICES DISTRICT


FROM THE CIRCUIT COURT OF ROCKINGHAM COUNTY
Bruce D. Albertson, Judge

(Tania L. Perez Rodriguez; John Elledge & Associates, on brief), for
appellant. Appellant submitting on brief.

(Sheila K. Paladino, Assistant County Attorney; Lynn Svonavec,
Guardian *ad litem* for the minor child, on brief), for appellee.
Appellee and Guardian *ad litem* submitting on brief.


        Hank Smith, Jr. (father) appeals an order terminating his parental rights. Father argues that

the circuit court erred by denying his motion to dismiss the Harrisonburg Rockingham Social

Services District's (HRSSD) petition to terminate his parental rights. Father contends that "by

allowing [HRSSD] to terminate his parental rights when he had a criminal matter pending [the

circuit court] deprived [f]ather of due process and equal protection of the law." Father also asserts

that the circuit court erred in finding that HRSSD "presented clear and convincing evidence that

terminating [f]ather's parental rights was appropriate and in the child's best interest pursuant to Va.

Code Ann. § 16.1-283." Upon reviewing the record and briefs of the parties, we conclude that the

circuit court did not err. Accordingly, we affirm the decision of the circuit court.

_____

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND[1]

"On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court." Yafi v. Stafford Dep't of Soc. Servs., 69 Va. App. 539, 550-51 (2018) (quoting Thach v. Arlington Cnty. Dep't of Hum. Servs., 63 Va. App. 157, 168 (2014)). Here, the Department was the prevailing party.

Father and Matraca Quinones (mother) are the biological parents of L.C. and T.C.[2] HRSSD initially became involved with mother and one of her older children in 2012 due to issues with illegal drugs and inadequate shelter. For years thereafter, HRSSD remained involved with mother and her family because of ongoing concerns about substance abuse, housing, hygiene, and abuse. HRSSD offered mother housing assistance, in-home parenting services, and foster care prevention services, as well as referrals for services from Infant Toddler Connection for L.C. and T.C.

In 2017, father lived with his girlfriend and her then-thirteen-year-old son in the Chesapeake/Norfolk area.[3] Father drove a truck and was away from home two weeks out of every three weeks. Although father occasionally called L.C. and T.C., he did not regularly visit them. In September 2017, L.C. and T.C. were supposed to visit father for two weeks. After

---

[1] The record in this case was sealed. Nevertheless, the appeal necessitates unsealing relevant portions of the record to resolve the issues appellant has raised. Evidence and factual findings below that are necessary to address the assignments of error are included in this opinion. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." Levick v. MacDougall, 294 Va. 283, 288 n.1 (2017).

[2] L.C. was born in 2014, and T.C. was born in 2015. Mother has other children who are not the subject of this appeal. Mother signed a voluntary entrustment agreement for T.C., and the Harrisonburg-Rockingham Juvenile and Domestic Relations District Court terminated her parental rights to T.C.

[3] When L.C. and T.C. entered foster care, father's girlfriend was pregnant with father's child; she subsequently gave birth to a daughter.

three or four days, father's girlfriend called HRSSD, reporting that L.C.'s behaviors were difficult to manage; mother picked up the children early.

In December 2017, HRSSD visited mother's home, which was described as "a complete disaster" because of its filth and clutter. HRSSD observed L.C. and T.C., who were three and two years old, playing with razor blade refills and laundry detergent pods. HRSSD followed up with several home visits and, on one occasion, found the home to be "extremely cold and without heat." Thereafter, HRSSD petitioned for a child protective order, which the Harrisonburg-Rockingham Juvenile and Domestic Relations District Court (the JDR court) entered on January 31, 2018. Mother tested positive for methamphetamine at the JDR court hearing. The Department then requested that L.C. and T.C. submit to hair follicle screens to assess their exposure, and T.C. tested positive for methamphetamine.[4]

On February 23, 2018, HRSSD placed L.C. and T.C. in foster care because of mother's drug use and protective order violations. The JDR court entered emergency and preliminary removal orders. The JDR court subsequently adjudicated that the children were abused or neglected and entered dispositional orders.

HRSSD arranged for father and his girlfriend to visit with L.C. and T.C. and investigated father as a relative placement. HRSSD advised father that he would have to demonstrate that he could provide a "stable, safe and nurturing environment" and cooperate with HRSSD. Father assured HRSSD that he could modify his work schedule to be home every other weekend if the Department placed the children with him. Father informed HRSSD that his girlfriend would care for L.C. and T.C. while he was working, but he also explored childcare options and Head Start programs at the Department's request. HRSSD referred father to parenting education, but "[d]ue to a cancellation of numerous visits," he did not participate in parenting education. After

---

[4] L.C.'s hair was too short to test.

- 3 -

approving a foster care plan with relative placement as one of the goals, the JDR court scheduled a permanency planning hearing for October 12, 2018.

On July 20, 2018, HRSSD began a trial home placement with L.C. and T.C. at father's home. HRSSD intended to transfer custody to father at the October 2018 permanency planning hearing.

At approximately 10:00 p.m. on September 23, 2018, father took L.C. and T.C. to the emergency room at DePaul Medical Center. Father reported that L.C. and T.C. were supposed to be sleeping, but when he checked on them, he found them "fighting and choking each other." L.C. had a "[s]mall contusion" in the corner of his right eye and "mild petechiae" around both eyes. T.C. also had "mild petechiae" around both eyes, mouth, and cheeks.

The next day, father brought L.C. and T.C. to Harrisonburg for a supervised visit with mother, and the visitation supervisor noticed the children's bruises. Father reported that the children had been fighting. Afterwards, HRSSD met with father, his girlfriend, the guardian *ad litem*, and other service providers to discuss the children's welfare and available services. HRSSD asked Norfolk Child Protective Services to investigate and referred father and his girlfriend to a parenting coach/counselor. Citing "supervision concerns," HRSSD decided not to transfer custody to father and moved to continue the October permanency planning hearing.

On Monday, November 12, 2018, father and his girlfriend were on their way to take the girlfriend's daughter to Virginia Beach, while the girlfriend's fourteen-year-old son stayed with L.C. and T.C. Her son called to say that L.C. was unresponsive; 911 was called and emergency personnel responded. Lifesaving measures were performed, but shortly upon his arrival at the Children's Hospital of the King's Daughters, L.C. was pronounced dead.

After performing an autopsy, the medical examiner determined that L.C.'s cause of death was blunt force trauma to the abdomen. Based on the reports that L.C. had had abdominal pain,

nausea, and vomiting beginning on Friday, November 9, 2018, and continuing throughout the weekend, the medical examiner concluded that L.C. was injured Friday night, "with the fatal blows being delivered on the day of death." The medical examiner opined that "death could not have occurred hours after the final injuries were inflicted. A timeframe of minutes is more likely." The medical examiner also noted that L.C. had suffered from blunt force trauma to his head, chest, and extremities, which was "consistent with abuse and neglect." The medical examiner identified "[b]etween 80 and 90 bruises" across L.C.'s face, jawline, chest, abdomen, upper extremities, and back, along with additional bruises on his lower extremities. The bruises were in "arrays of three or four, suggestive of grip marks and/or knuckle marks." There were "patterned injuries of the back suggesting a belt" and "repeated injury."

A few hours after L.C.'s death, at approximately 1:00 a.m. on November 13, 2018, father brought T.C. to the emergency room at DePaul Medical Center and reported that T.C. was coughing, wheezing, and had a fever. Father informed the hospital personnel that T.C.'s brother had died earlier that night "from vomiting." The hospital personnel spoke with a child protective services worker, who was "aware of" the situation and stated that T.C. was "safe to go home." After receiving medication, the hospital personnel determined that T.C. had "[n]o respiratory distress," discharged T.C., and provided father with "very strict return precautions."

The Norfolk police and Norfolk Child Protective Services investigated L.C.'s death.[5] Late in the afternoon on November 13, 2018, T.C. was taken to the Children's Hospital of the King's Daughters for an evaluation, and it was noted that T.C. had bruises on his right cheek, forehead, left shoulder, and lower back. T.C. was returned to foster care, and HRSSD no longer

---

[5] Norfolk Child Protective Services also removed father's and his girlfriend's daughter from their care.

considered father as a relative placement. T.C. began participating in play therapy and anger management to help him cope with and process the trauma he had experienced.

After L.C.'s death, father had "minimal contact and involvement" with HRSSD. Father, his girlfriend, and her teenage son were charged criminally after L.C.'s death; father was charged with felony homicide, child abuse/neglect, and child cruelty. Father was released on bond pending trial on the charges. As part of the conditions of his bond, father had to reside in the Chesapeake area and was barred from having contact with anyone under the age of eighteen. In addition, the JDR court ordered father not to have "direct contact" with T.C. In early May 2020, HRSSD confirmed that father was staying overnight at mother's home, in the Harrisonburg area, while her two young daughters were present.[6] Thereafter, the JDR court amended its order and prohibited father from having any contact, direct or indirect, with T.C.

On February 17, 2021, the JDR court entered orders approving the foster care goal of adoption and terminating father's parental rights to T.C. Father appealed the JDR court's order terminating his parental rights to the circuit court.

On April 30, 2021, the parties appeared before the circuit court. After hearing evidence and arguments, the circuit court terminated father's parental rights under Code § 16.1-283(C)(1), (C)(2), and (E)(iv). This appeal followed.

## ANALYSIS

### Motion to Dismiss

Father argues that the circuit court erred in denying his motion to dismiss HRSSD's petition to terminate his parental rights. Father asserts that allowing HRSSD to terminate his parental rights while his criminal case was pending "deprived [him] of due process and equal

---

[6] Father was found to have violated the conditions of his bond, but because the local jail had more than forty confirmed COVID-19 cases at the time, he was not incarcerated.

protection of the law." Specifically, father states that proceeding with the termination while his criminal charges remained pending forced him "to choose between his right to remain silent or present a case for the [circuit court] to determine whether his parental rights should be terminated."

The record does not include a timely filed transcript of the circuit court hearing. "The transcript of any proceeding is a part of the record when it is filed in the office of the clerk of the trial court within 60 days after entry of the final judgment." Rule 5A:8(a). The circuit court entered its final order on April 30, 2021; therefore, the deadline for filing the transcript was June 29, 2021. Father filed the transcript for the circuit court hearing late on July 2, 2021. Consequently, the transcript is not part of the record on appeal. Rule 5A:8.

We find that the transcript is indispensable to determining the first assignment of error on appeal. "If . . . the transcript is indispensable to the determination of the case, then the requirements for making the transcript a part of the record on appeal must be strictly adhered to. This Court has no authority to make exceptions to the filing requirements set out in the Rules." Shiembob v. Shiembob, 55 Va. App. 234, 246 (2009) (quoting Turner v. Commonwealth, 2 Va. App. 96, 99 (1986)); see also Bay v. Commonwealth, 60 Va. App. 520, 528-29 (2012). Father asserts that the circuit court erred by denying his motion to dismiss, which he made at the beginning of the hearing. We are unable to review the arguments and ruling without a timely filed transcript.

"The burden is upon the appellant to provide us with a record which substantiates the claim of error. In the absence [of a sufficient record], we will not consider the point." Robinson v. Robinson, 50 Va. App. 189, 197 (2007) (quoting Jenkins v. Winchester Dep't of Soc. Servs., 12 Va. App. 1178, 1185 (1991)); see also Rule 5A:8(b)(4)(ii). We conclude that the transcript is indispensable to resolving father's first assignment of error.

Termination of parental rights

Father also argues that the circuit court erred in finding that HRSSD presented sufficient evidence to support the termination of his parental rights.

"On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Castillo v. Loudoun Cnty. Dep't of Fam. Servs., 68 Va. App. 547, 558 (2018) (quoting Logan v. Fairfax Cnty. Dep't of Hum. Dev., 13 Va. App. 123, 128 (1991)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway, 59 Va. App. 185, 190 (2011) (quoting Martin v. Pittsylvania Cnty. Dep't of Soc. Servs., 3 Va. App. 15, 20 (1986)).

The circuit court terminated father's parental rights under Code § 16.1-283(C)(1), (C)(2), and (E)(iv). A court may terminate the parental rights of a parent who "has subjected *any* child to aggravated circumstances," if it is in the best interest of the child. Code § 16.1-283(E)(iv) (emphasis added). The statute defines "aggravated circumstances" as follows:

> torture, chronic or severe abuse, or chronic or severe sexual abuse,
> if the victim of such conduct was a child of the parent or a child
> with whom the parent resided at the time such conduct occurred,
> including the failure to protect such a child from such conduct,
> which conduct or failure to protect: (i) evinces a wanton or
> depraved indifference to human life, or (ii) has resulted in the
> death of such a child or in serious bodily injury to such a child.

Code § 16.1-283(E).

Here, HRSSD presented evidence that in September 2018, father took L.C. and T.C. to the hospital. Both L.C. and T.C. had bruises and "mild petechiae," which the visitation supervisor observed the following day. Father claimed that the then-four and three-year old children had inflicted the injuries on one another.

- 8 -

Less than two months later, L.C. died of blunt force trauma to the abdomen. During the autopsy, the medical examiner found approximately one hundred bruises on L.C.'s face, jawline, chest, abdomen, upper extremities, back, and lower extremities. The medical examiner opined that the bruises and trauma to L.C.'s body were "consistent with abuse and neglect" and indicated "repeated injury."

Father argues that he was not L.C and T.C.'s primary caregiver; rather his girlfriend was. The evidence, however, proved that father was home the weekend that L.C. died. By his own account, father was present in the home and supervising the children two months earlier when he took L.C. and T.C. to the hospital for other injuries. Considering the totality of the evidence presented in the record on appeal, HRSSD proved that while in father's custody, L.C. was subjected to "aggravated circumstances," because he had suffered "severe abuse" that caused his death. Code § 16.1-283(E).

Code § 16.1-283(E)(iv) applies to "any" child who has been subject to aggravated circumstances. Because L.C. was subjected to aggravated circumstances, Code § 16.1-283(E)(iv) also applies to T.C. Accordingly, the circuit court did not err in terminating father's parental rights to T.C. under Code § 16.1-283(E)(iv).

"When a trial court's judgment is made on alternative grounds, we need only consider whether any one of the alternatives is sufficient to sustain the judgment of the trial court, and if so, we need not address the other grounds." Kilby v. Culpeper Cnty. Dep't of Soc. Servs., 55 Va. App. 106, 108 n.1 (2009); see also Fields v. Dinwiddie Cnty. Dep't of Soc. Servs., 46 Va. App. 1, 8 (2005) (the Court affirmed termination of parental rights under one subsection of Code § 16.1-283 and did not need to address termination of parental rights pursuant to another subsection). Therefore, we do not consider whether the circuit court erred in terminating father's parental rights under Code § 16.1-283(C)(1) and (C)(2).

CONCLUSION

For the foregoing reasons, the circuit court's ruling is affirmed.

<u>Affirmed.</u>